# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

**UNITED STATES OF AMERICA**          **CRIMINAL NO. 08-0333-01**

**VERSUS**                            **JUDGE MELANÇON**

**JOSEPH RAY BERNARD**                **MAGISTRATE JUDGE METHVIN**

### FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS
*(Rec. Doc. 24)*

Before the court is the motion to suppress filed by defendant Joseph Ray Bernard. (Rec. 24).  An evidentiary hearing was held before the undersigned magistrate judge on April 17, 2009.  For the following reasons, it is recommended that the motion be denied.[1]

## FINDINGS AND CONCLUSIONS

### Background

Bernard is charged in a two-count indictment with possession of a firearm, a Lorcin .380 caliber pistol, serial number 534349, and ammunition, six .380 caliber cartridges, by a convicted felon, Title 18, United States Code, Sections 922(g)(1) and 924(a)(2), forfeiture, 18 U.S.C. § 924(d)(1).  The indictment resulted from an incident which occurred on April 7, 2008.  (Rec. Doc. 24-2).  On that day, Bernard's grandmother, called 911 to report possible drug activity going on at a white house on the corner of S. Orange Street and Sixteenth Street.  The officers responded to Bernard's residence.  Based on the evidence seized from the rear yard of the

---

[1] For purposes of the Speedy Trial Act, it is noted that an expedited, unofficial, transcript of the hearing was not received until May 12, 2009, and therefore the 30 days allowed for taking a pretrial motion "under advisement" did not begin to run until that date.  *See* U.S. v. Harris, ___ F.3d. ___, 2009 WL 1065970, 4 (5th Cir.2009) (a magistrate judge taking a pretrial motion "under advisement" is subject to a statutory limit of thirty excludable days under the Speedy Trial Act, Title 18 USCA § 3161(h)(1)(H)).  The court noted delay resulting from the filing of a pretrial motion through the conclusion of the hearing on ... such motion" is excludable for purposes of the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(D).  Id.  at 3.  The court noted additionally, the exclusion implicitly extends to "that time after a hearing needed to allow the trial court to assemble all papers reasonably necessary to dispose of the motion, e.g., the submission of post-hearing briefs."

residence, and statements made by Bernard, police officers obtained a search warrant for the residence and subsequently seized the gun and ammunition

Bertrand challenges the warrantless entry into the back-yard area of his residence, contending that the area in question is so intimately tied with the house that it must be considered a "curtilage"of his home protected by the Fourth Amendment.  Bertrand argues that officers of the Lafayette Police Department illegally entered and searched the area without a warrant and without probable cause and exigency.  Bertrand thus contends that all evidence obtained, including his statements, and the evidence subsequently seized from his home pursuant to a search warrant, should be suppressed under the "fruit of the poisonous tree" doctrine.

Bertrand also seeks to suppress the gun and ammunition seized from his residence, arguing that the search warrant obtained by the officers was not sufficiently particular.  He argues that, although the officers knew that Bernard had stated that he had a gun inside the residence, neither the affidavit nor the warrant identified guns or ammunition, and the search warrant is therefore invalid.

### *Issues Presented*

Did the Lafayette Police Department officers violate Bernard's constitutional right to be free from unreasonable searches and seizures when they went onto and searched his yard, arrested him, and subsequently searched his home?

### Evidentiary Hearing

Six witnesses testified at the evidentiary hearing:

1.       Officer Shannon Brasseaux, Lafayette Police Department.

2.       Officer Jeremy Courville, Lafayette Crimes Analyst.

3.      Officer Beau Guidry, Lafayette Police Department.

4.      Sergeant Blair Dore, Lafayette Police Department.

5.      Detective Kent Goolsby, Lafayette Metro Narcotics Task Force.

6.      Communications Supervisor, Regina Briscoe, Lafayette Police Department.

The testimony of two witnesses, Joseph Ray Bernard, Sr. and Gladys Bernard, were proffered by defendant and accepted by the Court.

Each witness will be addressed in turn.

**Officer Brasseaux** was assigned on the day of incident to the A.C.T.I.O.N. Unit which was developed to involve residents in helping to monitor and report crime in their neighborhoods.[2]  The Unit primarily targets narcotics activity and prostitution, and its duties include patrolling high crime areas.[3]  He has been in law enforcement for 20 years, including nine years with the Lafayette Sheriff's Department and eleven years with the Lafayette Police Department.

Officer Brasseaux testified as follows: Police officers received an incident report of possible narcotics activity/suspicious activity of individuals going in and out of a white house located on the corner of South Orange and 16th Street.  The incident report received by the officers is known as a "CAD" Report which document calls coming in from 911 to the dispatch office.[4]  Between 9:00 and 10:00 p.m., Brasseaux headed south down Orange Street from 12th Street.

---

[2] Through the use of photographs of the residence and its back-yard, Brasseaux described the scene on the night of the incident.

[3] Tr. 14.

[4] *See* testimony of Regina Briscoe, Communications Supervisor, Lafayette Police Department at Tr. 106.

Brasseaux advised the other officers traveling to the area to come in from all directions. Brasseaux explained that the majority of the neighborhoods that the Unit targets are drug infested and that the drug dealers, and the people on the streets become familiar with the Unit numbers and its methods.[5] The Unit constantly changes its ways but it always goes "in at different angles so that way if anyone runs from that area, we'll have an officer that will be able to intercept them at that location."[6] The Unit also uses this technique of surrounding a location for officer safety because weapons are commonly associated with narcotics incidents.[7]

When Brasseaux drove through the intersection he initially found that none of the houses on its corners matched the CAD report, and he saw no foot traffic.[8] However, he "looked back" and observed two individuals standing in the backyard of the house at the northwest quadrant of the intersection near a white Ford Expedition.[9] The Expedition was backed up into the backyard to the left side of the backyard area's open gate and faced 16th Street.[10] At that time, Brasseaux's observations matched the description from the CAD report - individuals, possible narcotics activity, and white house on the corner of South Orange and 16th.[11]

---

[5] Tr. 27.

[6] Id.

[7] Id.

[8] Tr. 16.

[9] Id.

[10] Tr. 23, Joint Exhibit 1.5 at B.

[11] Tr., 15, 17.

Officer Brasseaux turned his vehicle around and headed to the residence. Officer Paul Crozier arrived. Brasseaux and Crozier parked their cars in front of the residence so that individuals in the back could not observe the officers exiting from their cars.

Facing the front of Bernard's residence, Officer Brasseaux headed to its back by walking down the north side of the residence between the house and the neighbor's home.[12] Officer Crozier headed toward the back on the south side of the residence. Brasseaux chose to go directly to the back first rather than the front door because he had seen the individuals in the back.[13] Brasseaux stated that the area he traveled down was unobstructed. He did not see any "No Trespassing" signs or any other type of sign denying entry to the back-yard or back door or instructing that the front entrance only should be used. Brasseaux believed there was a primary, back entrance to the home because vehicles were parked in the back area. He testified that he knew from his past experience since 1992 patrolling the area that anyone going in and out would go through the back because vehicles were always parked there.[14]

Brasseaux rounded the corner of the residence and arrived into the back area of the house.[15] As he rounded the corner, Brasseaux saw a van and a female standing next to its driver's side door, and he smelled marijuana in the air.[16] He looked to his left and saw Bernard

---

[12] Tr.17, 37-38.

[13] Tr. 36.

[14] Tr. 37.

[15] Tr. 22, 37, Joint Exh. 1.4.

[16] Tr., 37.

walking quickly towards the back door of his house away from Officer Crozier's direction. Bernard and Brasseaux "kind of met up with each other."[17]

Another individual, Sydiryl Lewis, had walked to the other side of the Expedition out of Brasseaux's view.[18] There was also a third vehicle parked close to the back door of the residence.[19] Officers Jeremy Courville and Beau Guidry arrived within seconds of Officers Crozier and Brasseaux and parked their vehicle on 16th Street.[20]

When Brasseaux and Bertrand met up, Bertrand stated that he lived at the residence and Brasseaux asked for his I.D. Bertrand went into a bedroom in the house and quickly returned with it. For officer safety reasons, Brasseaux did not enter the home with Bertrand.[21]

As Bernard came back out of his house with his I.D., Officer Guidry signaled to Brasseaux that he had observed narcotics in plain view inside one of the vehicles; and everyone was detained.[22] Brasseaux confirmed that there was a gun located in plain view next to a cinder block and next to it was a hand rolled cigar containing marijuana.[23] Brasseaux relayed this information to Agent Goolsby who took over the investigation.[24]

---

[17] Tr. 25.

[18] Brasseaux testified that he had had numerous dealings with Lewis over the years and that he knew Lewis without needing to obtain identification. Tr. 40.

[19] Joint Exhibit 1.4 at C, D.

[20] Tr. 40.

[21] Tr. 39.

[22] Tr. 41.

[23] Bertrand was not charged with this weapon but the weapon that was seized by Agent Goolsby after getting the search warrant for the residence. Tr. 41.

[24] Id.

Brasseaux stated that, prior to the incident, Officer Blair Dore had notified the A.C.T.I.O.N. Unit that he had been obtaining a lot of information that there was much drug activity going on at this residence. Dore had directed the Unit members to continue monitoring the situation whenever they drove by and try to determine where the drug activity was "coming from exactly."[25]

Brasseaux testified in sum that the fence around the back area was made of chain-link; that the gate at the back area of the house in front of the vehicles facing 16th Street was completely open to the roadway/public; there were no obstructions to his view standing right on the sidewalk except for the vehicles; there were no barriers besides the vehicles; there were three people in the back area and there were additional people in the house, with an undetermined number.[26]

**_Officer Courville_** was also assigned to the A.C.T.I.O.N. Unit on the day of the incident.[27] He testified as follows: He was the third unit on the scene, within seconds of Officers Brasseaux and Crozier.[28] He parked on 16th Street, past the open gate, on the right side of 16th facing west.[29] He did not observe anyone in the front of the house; however, when he turned down the side of the house, he saw people walking in the yard and a house that matched the description that the

---

[25] Tr. 28.

[26] Tr. 28.

[27] Officer Courville had been employed with the Lafayette Police Department for seven years, assigned to the A.C.T.I.O.N. Unit in the narcotics field for six years, and been a police officer for 13 years. P. 44, 53.

[28] Tr. 48.

[29] Id., Joint Exh. 1.5, X2C.

officers had been given.[30]  Although he did not see any illegal activity upon driving up, nor did

he see any contraband from the street, Courville smelled burnt marijuana instantly as he opened

his door to exit his vehicle.[31]

Courville explained that the chain link fence was three or four feet high, and he could see

over the fence and through it.[32]  Courville testified that he could have seen the marijuana and the

handgun immediately; however, he did not because he was preoccupied with getting out of his

vehicle, and because of the individuals in the yard.[33]  He chose to get closer because of the

number of people in the yard.[34]

Courville testified that when he was driving up he saw an individual wearing a black, red,

and white shirt who had walked from the fence line toward the house and was being detained by

another officer.[35]  Courville testified:

> I just followed the smell that I was smelling to their -- there was three little
> makeshift chairs or cinder blocks that were in front of the side of the house. When
> I walked up to it, there was a cigar that was filled with marijuana still burning on
> there. Directly behind the marijuana cigar was a Barq's Root Beer bottle filled
> with a red liquid that we later realized was liquid Codeine, and there was also a
> handgun.
>
> * * *
>
> At that point I secured those items and gave them to Officer Sanchez to secure in
> his unit, and then I proceeded to the area that I saw the individual walk from. And

---

[30] Tr. 55.

[31] Tr. 51, 56.  This information was not included in his police report.  (Tr. 55).

[32] Tr. 59.

[33] Id.

[34] Id.

[35] Tr. 49.

when I got to that area, directly on the other side of the fence were two medicine bottles for liquid Codeine and a blue bag that also later was found to contain more narcotics and cash.[36]

**_Officer Beau Guidry_** testified as follows. He has been with the Lafayette Police Department for 10 years and was assigned to the A.C.T.I.O.N. Unit on April 7, 2008.[37] Along with the other Unit officers, Guidry was dispatched to the corner of South Orange and 16th Street by the CAD report of possible narcotics sales.[38] Guidry went to the white house on the corner as described by the CAD report and where other officers had already arrived.[39] Guidry explained that the main entrance to the driveway is on 16th Street and that the house had a back entrance.[40] Guidry believed that, on the night of the incident, the rear door appeared to be the main entrance because there was nothing blocking it.[41]

When he parked his car on 16th Street, he noticed that the gate was open and estimated that the hurricane fence, a standard chain link fence, is about 4 feet tall.[42] He was able to see over and through the fence from the sidewalk.[43]

---

[36] Tr. 49-50, 52. Courville later identified him as Sydiryl Lewis.

[37] Tr. 61.

[38] Tr. 62.

[39] Tr. 62, 67.

[40] Tr. 69.

[41] Id.

[42] Tr. 63.

[43] Id.

Officer Guidry exited his vehicle, walked around its front, through the gate and in between a compact car and a larger Expedition Ford.[44]  He immediately began to "clear" the vehicles, i.e. make sure no one is hiding inside, for officer safety in accordance with his general training and his SWAT training.[45]  He observed on the floor of the Expedition a baggy of white rock shape substances which appeared to him to be crack cocaine.[46]  He signaled this information to Officer Brasseaux.[47]

**_Sargent Dore_** testified as follows. Also a member of the A.C.T.I.O.N. Unit on the evening of April 7, 2008, Dore has been employed with the Lafayette Police Department for 17 ½ years.  He arrived with Agent Goolsby after the initial investigation and so does not have personal knowledge of the incident.[48]

Sargent Dore explained that, prior to the incident report of April 7,  his lieutenant had gotten citizen complaints and complaints from neighbors in the area of 1122 S. Orange St. regarding possible narcotics activity.[49]  There had been an ongoing complaint about this residence and the Unit had "talked about it at briefings several times prior to that day."[50]

---

[44] Tr. 67.

[45] Tr. 64-65.

[46] Id.

[47] Id.

[48] Tr. 82.

[49] Tr. 73-74.

[50] Tr. 74.  At this point in the testimony, the government introduced Gov't Exh. 4, a _Cad Summary Report_, for calls for service within 1000 feet of 1122 S. Orange St. From January 1, 2006 through January 2, 2000, over defense objection.  The objection was overruled, the court indicating that appropriate weight would be given to the exhibit when the motion was considered  The court will not weigh the report heavily because it includes reports that are unclear as to the subject of the complaint.

***Detective Goolsby*** testified as follows.  He has been employed by the Lafayette Police Department for 12 ½ years, had spent 4 years in patrol, 4 years with the A.C.T.I.O.N. Unit, and the last 4 ½ years with the narcotics task force.[51]  Goolsby interviewed Bernard following the incident regarding whether there were drugs in the house.[52]  Bernard responded that there were no drugs but that his deceased mother had a gun there.[53]  Goolsby did not include this information in his application for the search warrant but only identified the drugs that were found in the back-yard and the car.[54]  Likewise, the warrant that issued was limited to the searching for illegal narcotics and drug paraphernalia and says nothing about a gun.[55]  Goolsby believed "absolutely" that because of the evidence seized from the back-yard there was probable cause that there were drugs in the house.[56]  Goolsby confirmed that Sydiryl Lewis was driving the Ford Expedition.

Pursuant to his execution of a search warrant following the April 7 incident, Goolsby located a handgun in a dresser drawer and a small metal smoking pipe with burnt residue in the same bedroom.[57]  The pipe was not tested for drugs, and thus were no drugs found in the house.

---

[51] Tr. 85.

[52] Tr. 87.

[53] Id.

[54] Tr. 87-90.

[55] Tr. 90.

[56] Tr. 89.

[57] Tr. 85-86.

However, it was Goolsby's opinion that the residue was narcotics.[58]  When Goolsby opened the

drawer the gun was in plain view.[59]

 **_Proffer - Joseph Ray Bernard_** - The court accepted as proffer that Mr. Bernard's

testimony would be that the backyard area was used for cookouts and entertaining and that the

residence's front door was used as a main entrance.[60]

 **_Proffer - Gladys Bernard_** - The court accepted the proffer that Ms. Bernard's testimony

would be that she called 911 on the night of the incident to report that drug activity was going on

at the house next door to her on the corner of South Orange St. and 16th, and that she was not

complaining about her grandson's house.[61]

 **_Regina Briscoe_** - Ms. Briscoe testified in order to explain the information included in the

CAD reports.[62]  Ms. Briscoe explained that the "top part of the report" remains the same for each

report generated on the incident and includes the date and time of the initial 911 phone call, the

telephone number, and the 911 dispatcher.[63]  The second section of the CAD report informs

---

[58] Tr. 91-92.

[59] Tr. 93.

[60] Tr. 94-95.  The court did not accept a proffer regarding efforts to keep the gate closed and that the front door was the main residence, finding that such testimony to be irrelevant in light of the fact that the state of affairs on April 7 is issue determinative.

[61] Tr. 98-102.  The court has listened to the 911 call.  In that call, Mrs. Bernard stated that there was probable drug activity going on at the white house on the corner of 16th Street and Orange, and that the house was the one next door to her house.  She did not give her address during the phone call.  Exh. JE-5.

[62] Tr. 106.

[63] Tr. 106-107.

which units were dispatched, the time of their arrival or en route time, and the time they leave the call.[64]

The final portion is the remarks section which includes any information that a complainant provides to the 911 operator or dispatcher.[65]  The initial complaint did not include an address; the officers were dispatched to a white house at the intersection of South Orange and 16th Street.[66]  Ms. Briscoe explained that the report shows an incident code PICP, or "suspicious circumstances" and possible drug activity, subjects going in and out of house.[67]  The report provides additional information that the complainant, Ms. Bernard, was notified at 21:36 hours that there had been a delay in dispatching officers, and the comments then show that officers reported that drugs were recovered at 21:49 hours.[68]  An additional attachment was next made at 21:50 hours that identified the house as being at 1121 S. Orange Street.[69]

### Analysis

Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment subject only to a few specific exceptions.  Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 514 (1967). The government has the burden to show, by a preponderance of the evidence, that a warrantless search falls within one of the exceptions.  Vale v. Louisiana, 399

---

[64] Tr. 107.

[65] Tr. 108.

[66] Tr. 116.

[67] Tr. 110, Exh. JE4, Bates #00067.

[68] Exh. JE4, Bates #00068.

[69] Id.

U.S. 30, 34, 90 S.Ct. 1969, 1972 (1970); United States v. Chavis, 48 F.3d 871 (5th Cir. 1995).

Exceptions to the warrant requirement include "investigatory detentions, searches incident to a valid arrest, seizure of items in plain view, exigent circumstances, consent searches, vehicle searches, container searches, and searches in which the special needs of law enforcement make the probable cause requirement impracticable." U.S. v. Cota-Lopez, 358 F.Supp.2d 579, 590 (W.D.Tex. 2002).

## I. *Constitutionality of the police officer's actions on April 7, 2008*

### A. Was the residence's back-yard area a curtilage protected by the 4th Amendment?

The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV.

The Fifth Circuit has held:

The Fourth Amendment extends to protect the "curtilage" of a home from unconstitutional searches. United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). The "curtilage" constitutes the area within which a person "reasonably may expect that the area in question should be treated as the home itself." Id. In determining whether an area outside the home is curtilage, we must consider four factors: the proximity of the area to the home, whether it is within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from outside observation. Id. at 301, 107 S.Ct. at 1139. The Supreme Court explained that these factors are not to be "mechanically applied;" instead they are helpful to the extent they shed light on the ultimate inquiry of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. at 301, 107 S.Ct. at 1140.

U.S. v. Thomas, 120 F.3d 564, 571 (5th Cir. 1997).

As to the first factor, it is clear from the photographs and testimony that the area at issue is proximate to the home and the government does not dispute this.[70]  This factor weighs in favor of Bernard.

As to whether the area at issue was within an enclosure surrounding the home, each of the testifying officers confirmed that the fence at the rear of Bernard's residence was a chain-link or "hurricane" fence about 4 feet tall.[71]  Each of the officers, however, confirmed that the fence's gate stood open.   The officers further testified that there was no indication that the open gate should not be entered – the gate had no bell nor did it bear any sign forbidding passage and/or requiring that the residence be entered through the front door only.  Thus, the undersigned concludes that the enclosure was not complete and finds this factor does not weigh in defendant's favor.

Joseph Ray Bernard, Sr.'s proffered testimony that the area was used for entertaining and cook-outs is unrefuted.   Additionally, the undersigned notes that, on the day of the incident, several individuals were gathered in the area which is consistent with the Bernard proffer.  The undersigned finds this factor to weigh in defendant's favor.

As to the final factor, the undisputed evidence is that the fence was a standard chain link fence that could be seen over and seen through.  The undersigned concludes that no steps had been taken by Bernard to protect the area from outside observation.

---

[70] Tr. 121.

[71]   The undersigned notes that the rear area and home were not totally surrounded by fencing because Officer Brasseaux was able to access the back area from the front of the house through the side yard.

The undersigned concludes that Bertrand's lack of efforts to protect the area from observation taken together with the evidence that the gate stood open when the officers arrived strongly indicate that the area at issue is not curtilage.

Further supporting this finding is officer testimony that they believed the back door to be the primary entrance into the residence because on the night of the incident there were vehicles were parked in the rear nor were there any barricades restricting access to the rear door. Common-sense dictated that the officers go straight to the back because this is where they observed the complained of activity - not the front.

Based on the evidence adduced, including the officer testimony and photographs, the undersigned concludes that it was reasonable for the officers to believe that the back door was readily accessible to the public through the open gate and was the principal means of accessing Bernard's residence. Having found that the rear yard to Bernard's residence is not so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment Protection, the undersigned concludes that the police did not violate the Fourth Amendment by entering the back-yard area of the home.

### *B.*     **Were there exigent circumstances and probable cause that a crime?**

The undersigned finds that, even if the area should be protected under the Fourth Amendment as the curtilage of Bertrand's home, the officers' search of the area was supported by probable cause and exigent circumstances.

The Fifth Circuit has held there is no set formula for determining when exigent circumstances may justify a warrantless entry; however, it has held in the past that the possibility that evidence will be removed or destroyed, the pursuit of a suspect, and immediate safety risks

to officers and others are exigent circumstances that may excuse an otherwise unconstitutional intrusion into a residence. U.S. v. Newman, 472 F.3d 233, 237 -238 (5th Cir. 2006). The Fifth Circuit has created a non-exhaustive five-factor list to determine whether exigent circumstances exist:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage.

U.S. v. Mata, 517 F.3d 279, 287 (5th Cir. 2008).

This case involves officer safety and the possibility of the destruction of contraband. Exigent circumstances exist if the officers' fear for their safety was reasonable. Newman, 472 F.3d at 237. Here, the officers were responding to a complaint of possible drug activity, an activity where, according to Officer Brasseaux's testimony, it is common for weapons to be involved, and the officers saw three individuals in the back-yard.[72] It was reasonable for the officers to fear for their safety in that one of the individuals could have a gun in the yard and use it. In fact, a gun was found. It is equally clear that the suspects were aware of the officers were on their trail as Bernard was heading for his back door. The situation presented - that of reported drug activity with "individuals going in and out of house" - was one in which contraband could readily be destroyed.[73] Officer Brasseaux specifically testified that officers come in from all

---

[72] Tr. 27.

[73] JE-4.

directions in their vehicles because it is common for suspects to run in the type of incident presented here, possible drug violations. The undersigned therefore finds that exigent circumstances were presented.

In order to enter a person's residence, even under exigent circumstances, law enforcement first must have probable cause to believe that contraband is inside or that an illegal act is taking place. Newman, 472 F.3d at 236.[74] Defendant argues that the officers were dispatched to a corner house at the intersection of So. Orange and 16th and that there were four houses at this intersection. Defendant argues that, even though there were several houses, the officers went straight to his house and into the backyard, because of previous intelligence, not because of any information given them by the dispatcher, and without observing any illegal activity.

Here, it is clear that the officers had probable cause to believe there was contraband inside Bertrand's home or yard or that an illegal act was taking place. First, the CAD reports show and the officers testified that they reported to the white house on the corner of the intersection as directed. Officer Brasseaux testified that he observed activity in the back-yard area of Bertrand's residence which was the only house that matched the dispatch description. Two officers smelled burning marijuana immediately - Officer Brasseaux smelled it when he rounded the northwest corner of the house into the back-area and Officer Courville smelled burning marijuana as soon as he got out of his vehicle on 16th Street. Courville testified that the marijuana and the handgun were in plain view through the chain-link fence and he did not

---

[74] Probable cause means more than mere suspicion, but it does not require proof beyond a reasonable doubt. U.S. v. Froman, 355 F.3d 882 (5th Cir. 2004), *citing* U.S. v. Daniel, 982 F.2d 146, 151 (5th Cir. 1993). Probable cause exists when the facts are "sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and the person to be arrested or searched committed it." Froman, 355 F.3d at 889.

observe them immediately only because he was preoccupied with getting out of his vehicle, and because of the individuals in the yard. This evidence is simply buttressed by the fact that the officers had received previous intelligence that much information was being obtained that there was a lot of drug activity going on at the residence.[75]

Moreover, the undersigned finds each officer's testimony that he went to the residence because it matched the CAD report to be credible and further concludes that there is no evidence that any of the officers were in bad faith in going to Bernard's residence in response to the CAD report.

Having concluded that there was probable cause to search the rear yard, and given the exigent circumstances, the search was justified.

## II.    *Sufficiency of the Search Warrant*

The search warrant was signed on April 7, 2008 at 11:50 p.m. and described the items to be seized:

> Cocaine, Marijuana, MDMA, containers and other objects used, intended for use in storing or concealing, Cocaine, Marijuana, MDMA, capsules, balloons, envelopes, plastic bags, and other containers used, intended for use or designed for use in packaging Cocaine, Marijuana, MDMA or any and all other drug paraphernalia and all currency, bonds, negotiables, or other tender obtained by the use and or sale of illegal substances. Any and all records and documents, both conventional and unconventional, related to the illegal trafficking of Cocaine, Marijuana, MDMA.[76]

Bernard argues that the gun and ammunition should be suppressed because the warrant does not mention them. It is well-settled that "[a] warrant must particularly describe the place to be searched and the person or things to be seized." United States v. Moser, 123 F.3d 813, 823 (5th

---

[75] Tr. 28.

[76] JE 3.

Cir. 1997), citing <u>United States v. Kimbrough</u>, 69 F.3d 723, 727 (5th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1157, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996).  To determine whether the description of the items to be seized is sufficient, "a court must inquire whether an executing officer reading the description in the warrant would reasonably know what items are to be seized."  <u>Moser</u>, 123 F.3d at 823, citing <u>Kimbrough</u>, 69 F.3d at 727.

"Generally only items described in a search warrant may be seized. An exception to this general rule, however, is found where a police officer has a warrant to search a given area for specified objects and in the course of the search comes across some other article of incriminatory character. The property is then seizable under the plain view doctrine."  <u>U.S. v. Bills</u>, 555 F.2d 1250, 1251 (5th Cir. 1977).

Here, Agent Goolsby, pursuant to the warrant, searched Bernard's bedroom, opened his top dresser drawer, and found the Lorcin handgun and ammunition in plain view.  Agent Goolsby was aware when he executed the warrant that Bernard was a convicted felon.[77]  Bernard's possession of the gun and ammunition was a violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) which prohibit the possession of these items by a convicted felon.  The gun and ammunition were thus evidence of a crime and contraband.  The undersigned therefore concludes that the seizure of the gun and ammunition were permissible under the "plain view" doctrine.

### *Conclusion*

For the foregoing reasons, **IT IS RECOMMENDED** that defendant's motion to suppress be **DENIED.**

---

[77] Tr. 85.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation within ten (10) days from the date of its service, or within the time frame authorized by Fed.R.Civ. P. 6(b), shall bar an aggrieved party from attacking the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on June 1, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)